SUPERIOR COURT 
 
 COMMONWEALTH ex rel. JOHAN ROSENBERG vs. JPMORGAN CHASE & CO. & others[1]

 
 Docket:
 SUCV2014-03323-BLS1
 
 
 Dates:
 July 23, 2019
 
 
 Present:
 /S/Mitchell H. Kaplan Justice of the Superior Court
 
 
 County:
 
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT 
 
 

 @COMMONWEALTH ex rel. JOHAN ROSENBERG vs. JPMORGAN CHASE & CO. & others[1]
@SUCV2014-03323-BLS1
@MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT 
 The plaintiff and relator, Johan Rosenberg, filed this qui tam action on behalf of the Commonwealth against the defendants, JPMorgan Chase & Co.; JPMorgan Chase Bank, NA; J.P. Morgan Securities LLC; JPMorgan Securities, Inc.; Citigroup, Inc.; Citigroup Global Markets Inc.; Citibank NA; Citigroup Financial Products Inc.; Citigroup Global Markets Holdings Inc.; Bank of America Corporation; Bank of America NA; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley; Morgan Stanley Smith Barney LLC; Morgan Stanley & Co. LLC; Morgan Stanley Bank, N.A.; Morgan Stanley Capital Services Inc.; and Morgan Stanley Capital Group Inc., asserting a violation of the Massachusetts False Claims Act,
---------------------------
  [1]JPMorgan Chase Bank, NA; J.P. Morgan Securities LLC; JPMorgan Securities, Inc.; Citigroup, Inc.; Citigroup Global Markets Inc.; Citibank NA, Citigroup Financial Products Inc.; Citigroup Global Markets Holdings Inc.; Bank of America Corporation; Bank of America NA; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley; Morgan Stanley Smith Barney LLC; Morgan Stanley & Co. LLC; Morgan Stanley Bank, N.A.; Morgan Stanley Capital Services Inc.; and Morgan Stanley Capital Group Inc.
 - 1 -
G.L. c. 12, §§ 5A-50 (the Act).[2] The relator alleges that the defendants engaged in fraud and collusion in connection with their obligations as "remarketing agents" (RMAs) for variable rate, tax exempt bonds, commonly referred to as Variable Rate Demand Obligations (VRD0s), issued by the Commonwealth or one of its cities, towns, counties, or government agencies. More specifically, he alleges that the defendants made false representations to the Commonwealth regarding their conduct in respect of their alleged obligation "to actively and individually reset and remarket VRDOs at the lowest possible [interest] rates." The relator contends that as a result of this fraudulent rate-setting conduct, the Commonwealth paid hundreds of millions of dollars in excess interest and fees since at least April of 2009. The relator's Second Amended Complaint (complaint) pleads a single count asserting a violation of the Act, premised upon this alleged fraudulent activity.
 The case is presently before the court on a joint motion to dismiss filed by defendants JPMorgan, Citigroup, Merrill Lynch, and Morgan Stanley for failure to state a claim upon which relief can be granted. See Mass. R. Civ. P. 12(b)(6).[3]
---------------------------
 [2] "A qui tam action is an action brought by an informer sometimes called a 'whistle blower' whose motive is to expose and redress a wrong, generally a fraud or false claim against the government and also to collect his bounty for his action." Phone Recovery Servs., LLC v. Verizon of New England, Inc., 480 Mass. 224, 225 n.3 (2018), quoting Scannell v. Attorney Gen., 70 Mass. App. Ct. 46, 49 (2007) (citation and internal quotation marks omitted). The Act "encourages individuals with direct and independent knowledge of information that an entity is defrauding the Commonwealth to come forward by awarding to such individuals a percentage of the Commonwealth's recovery from the defrauding entity. See G.L. c. 12, §§ 5A, 5C(2), 5F." Scannell v. Attorney Gen., 70 Mass. App. Ct. at 48. "To be entitled to the bounty, an individual in possession of such knowledge must attain the status of a 'relator' by filing suit against the defrauding entity in Superior Court in the name of the Commonwealth or a subdivision thereof" Id. at 48-49.

[3] The defendants report that the relator named a number of entities affiliated with each defendant investment bank, but several of these entities are not properly defendants, and the parties are discussing which defendants should be voluntarily dismissed. In view of the court's ruling on this motion to dismiss, this issue is moot.
 - 2 -
 While the defendants argue that the complaint should be dismissed for a number of reasons, including that the relator fails to allege a fraudulent claim actually made to any governmental body, or at least alleged it with the specificity required by Mass. R. Civ. P. 9(b), the court finds that one of the grounds for dismissal on which the defendants rest their motion is squarely applicable to the "facts" alleged by the relator. As will be seen, all of the factual allegations in the complaint are based upon information generally available to the public on websites maintained by the government, self-regulatory agencies established by the securities industry, or news media. The allegations of fraud are based upon the relator's individual analysis of this public data, and the conclusions that his analysis led him to are also based on this public data. While the issue is one of first impression under the Massachusetts version of the Federal False Claims Act, this court joins the majority of federal courts in holding that, under these circumstances, the factual allegations in the complaint are substantially the same as publicly disclosed transactions, and the relator is not the original source of the information alleged. In consequence, the Relator's qui tam complaint fails to state a claim based on the Act's public disclosure bar, and the motion to dismiss is ALLOWED.
BACKGROUND 
 The following facts are drawn from the allegations in the forty-page complaint and assumed to be true for the purposes of this motion. Because the motion turns on the question of public disclosure and original source, details concerning the relator's analysis of the data and
 - 3 -
why, in his opinion, that demonstrates fraud are only generally described.
 The Parties 
 The relator, Rosenberg, is a Minnesota resident. He has over twenty years of experience advising municipalities and other clients on issuing securities, particularly VRDOs and other types of municipal bonds. Through his work in the industry, Rosenberg became suspicious that the defendants and other VRDO-RMAs were colluding to systematically reset the VRDO interest rates on an algorithmic or some other kind of mechanical basis, a practice he refers to as "RoboResetting."[4] According to the relator, this caused artificially high interest rates to be set for these securities and resulted in the Commonwealth paying fees for services that the RMAs were not actually providing. Rosenberg "confirmed his suspicions after performing an extensive forensic
---------------------------
  [4]`Robo-Resetting' is not a term generally in use in the securities industry, but rather one coined by the relator for this case. The court notes that the relator has not alleged the existence of any statement by a defendant, rule, or industry standard that suggests that interest rates would not be set by use of computer programs, that of necessity, would be based on algorithms that should be designed to determine the lowest rates that could be set for these securities that would induce investors to purchase them at par (a process further described infra) given characteristics of the issuer, the RMA, the financial institution that provided letters of credit securing repayment, and market conditions, i.e., cause the VRDOs to clear the market. Indeed, at oral argument, counsel for the relator conceded that rates would necessarily be set in this manner. The question of whether the rate was the lowest rate that could achieve the goal for a particular VRDO would be dependent on the skill with which the programs were developed and the nature of the inputs used, including whether they accounted for attributes unique to a particular issuer and financial guarantor. To constitute fraud, a defendant would have to knowingly misuse technology to its advantage. It appears to this court that the term `Robo-Resetting' was coined because of its similarity to the term Robo-Signing,' which gained use during the residential mortgage crisis and tends to connote unscrupulous conduct by financial institutions in connection with residential mortgage foreclosures. See, e.g., Wilson v. HSBC Mortgage Servs., Inc., 744 F.3d 1, 13-14 (1st Cir. 2014) (describing the various definitions given that term in connection with the creation of foreclosure documentation). The court will use the term `Robo-Resetting' in this memorandum of decision, but notes that there is nothing fraudulent or unlawful in the use of computer programs to set interest rates for VRDOs.
 - 4 -
analysis of the interest rates and other market data—for the April 1, 2009 through November 14, 2013 period—for the Massachusetts VRDOs. . . for which [d]efendants have served as the RMA." Complaint at para. 8.
 Defendants JPMorgan, Citigroup, Merrill Lynch, and Morgan Stanley are financial services companies that do business in the Commonwealth and throughout the United States. Since April 1, 2009, the defendants served as the RMAs for approximately 242 VRDOs issued by the Commonwealth or its government subdivisions, which had an aggregate value on issue of approximately $11.8 billion.
 VRDOs 
 VRDOs are tax-exempt, variable rate municipal bonds with interest rates that are set on a periodic basis, typically weekly. Although VRDOs are long-term bonds, they are attractive to issuers like Massachusetts and its municipalities, authorities, and agencies[5] because, even though these bonds permit the issuers to borrow money for long periods of time, the interest rates they pay are reset, typically weekly, by RMAs. In consequence, issuers of VRDOs are able to borrow money for extended periods at short-term interest rates.
 Purchasers of VRDOs have a "put" option, which allows them to tender the VRDOs for repurchase, generally on a weekly basis, at their face value ("par") plus any accrued interest. Additionally, VRDOs are secured by letters of credit provided by highly-rated commercial banks to protect investors in the event that the RMA is unable to find new investors to purchase the bonds tendered pursuant to the put. If that happens, the obligation to purchase the tendered bond
---------------------------
  [5] For simplicity, the issuer of the VRDOs will hereafter be referred to as the Commonwealth.
 - 5 -
falls on the provider of the letter of credit, and often, this is the RMA itself. The holder of the letter of credit then must look to the issuer for repayment. Investors are, therefore, attracted to VRDOs because they are low-risk, high-liquidity, and tax-free investments.
 Currently, issuers pay letter of credit providers an annual fee of between 50 and 150 basis points of the VRDO debt balance for this liquidity and credit enhancement feature. Several defendants in this case serve as both the RMA and letter of credit provider for a number of their Massachusetts VRDOs. The largest holders of VRDOs are tax-exempt money market funds, which the defendants also often own or manage.
 The VRDOs in this case are primarily issued by state and local public entities, such as municipalities, agencies, public universities, and hospitals, to raise money to fund various longterm projects or infrastructure. However, some of the VRDOs are issued by public entities on behalf of non-governmental entities (so-called conduit borrowers) to finance qualified projects and programs. The Commonwealth issues conduit bonds to provide tax-exempt financing for conduit borrowers who need low-cost capital to develop infrastructure like airports and affordable housing facilities.[6]
 The Responsibilities of RMAs 
 Each issuer contracts with an RMA to manage each VRDO that it issues. RMAs have two basic jobs for which issuers like the Commonwealth pay an average annual fee of approximately 10 basis points of the VRDO debt balance. First, RMAs are required to set,
---------------------------
 [6] The defendants argue that conduit financing transactions cannot give rise to claims under the Act, as no government entity has any financial obligations with respect to these VRDOs as these fall exclusively on the conduit borrowers. The court does not address this argument in this opinion.
 - 6 -
typically on a weekly basis, the VRDO interest rate at the lowest rate that will clear the market. The relator contends that this rate reset must be based on an individual determination of what rate the specific VRDO will require considering the unique characteristics of the bond, the relevant market conditions, and the particular investor demand for the specific bond at issue. Second, RMAs are required to actively "remarket" the VRDOs to replacement investors when the existing investor "puts" the bond back to the RMA such that the VRDO will be repurchased at its par value plus any accrued interest.
 The relator points to three sources setting forth these two responsibilities of RMAs. First, the Municipal Securities Rulemaking Board (MSRB) promulgates rules that cover RMA duties to VRDO issuers. MSRB rules are enforceable by regulatory agencies, including the U.S. Securities and Exchange Commission and the Financial Industry Regulatory Authority. MSRB Rule G-17 requires RMAs to deal fairly and honestly with VRDO issuers. MSRB Rule G-18 requires RMAs to secure a fair and reasonable interest rate for VRDO issuers based on prevailing market conditions.
 The second source of RMAs' responsibilities is the Securities Industry Financial Markets Association (SIFMA) Model Disclosures promulgated pursuant to MSRB Rule 0-17. These are disclosures that SIFMA advises RMAs to make to VRDO issuers to comply with their MSRB Rule G-17 obligations to deal fairly and honestly with issuers. The SIFMA Model Disclosures provide that an RMA is: "required to set the interest rate at the rate necessary, in its judgment, as the lowest rate that permits the sale of the VRDOs at 100% of their principal amount (par) on the interest reset date." Complaint at para. 32.
 The third source of the RMAs' obligations is the remarketing agreements between the
 - 7 -
defendants and the Commonwealth. According to the relator, each agreement contains provisions requiring the defendants to set and actively remarket the VRDOs they manage at the lowest possible rate based on an individual determination. For instance, an offering statement dated May 24, 2010 concerning $1.1 billion in VRDOs issued by the Massachusetts Department of Transportation and remarketed by JPMorgan states: "Pursuant to the Remarketing Agreement, the Remarketing Agent is required to determine the applicable rate of interest that, in its judgment, is the lowest rate that would permit the sale of the [VRDOs] bearing interest at the applicable interest rate at par plus accrued interest, if any, on and as of the applicable Rate Determination Date. The interest rate will reflect, among other factors, the level of market demand for the [VRDOs] . . . ." Complaint at para. 34. In response to various solicitations for VRDO remarketing services by the Commonwealth and consistent with their contractual and regulatory obligations, the defendants represented that they would secure the lowest VRDO interest rates. The relator, however, alleges that the defendants failed to do this, and instead, "set interest rates at sufficiently high levels to minimize the need for the remarketing and other services they agreed to provide." Complaint at para. 37. The relator asserts that:
 
In short, Defendants have not complied with their obligation to actively and individually[7] reset and remarket Massachusetts's VRDOs at the lowest possible rate. Instead, they have collectively engaged in their Robo-Resetting scheme to minimize their need to provide remarketing services, secure artificially high VRDO rates, extract from Massachusetts improper and excessive remarketing
---------------------------
  [7] The court notes that the words "actively and individually reset" do not appear in any of the defendants' statements or the rules or standards that the relator references in the complaint, but rather appear to be the relator's interpretation of what the statements, rules, and standards mean. The defendants point to this discrepancy in asserting that the relator has failed to adequately plead fraud. Because the court's ruling does not turn on this argument, it will not address it.
 - 8 -
 
and letter of credit fees, and ultimately cause[d] Massachusetts to pay more than one hundred million dollars in VRDO-related overcharges.
Complaint at para. 38.
 Robo-Resetting & Relator's Forensic Analysis 
 As discussed above, the relator contends that the defendants "have engaged in a practice of setting their VRDO rates mechanically and collectively, without any consideration of the unique attributes of each particular bond," i.e. "Robo-Resetting." Complaint at para. 39. The relator opines that Robo-Resetting leads to higher than necessary interest rates and this, in turn, causes existing bond holders not to exercise their put options, so that the defendants do not have to remarket the VRDOs to other investors who are willing to hold the same bond at a lower interest rate.
 The relator performed a forensic analysis of the defendants' rate-setting practices over a four-and-a-half-year period from April 1, 2009 through November 14, 2013. The forensic analysis covers more than 20,000 Committee on Uniform Securities Identification Procedures (CUSIPs)[8] and almost five million data points and took more than 1,000 hours.[9]
 The relator explains this forensic analysis on pages eleven through thirty-four of the complaint. According to the relator, the forensic analysis reveals that for likely all of the
---------------------------
  [8] VRDOs are individually identified by their CUSIP number, a code assigned to U.S. stocks and bonds for tracking and trading purposes.

 [9] The complaint alleges that the data analyzed included some "non-public, proprietary sources." At oral argument, however, counsel for the relator explained that all of the data was publicly available on industry and regulatory websites; however, the relator had to pay a fee for some of the composite, historic data.
 - 9 -
VRDOs that the defendants manage, the defendants group a collection of unrelated bonds into "buckets" and set their interest rates collectively.10 This opinion is based upon the relator's conclusion that, as to each VRDO in a particular bucket, there exists an identical pricing spread that moves the interest rate of each bond in the bucket up or down in lock-step fashion. The relator therefore infers that the defendants did not make an individual determination of what the appropriate interest rate should be for a particular bond and did not make an effort to secure the lowest possible interest rate for the bond. In his view, it is statistically impossible that any bucketing would have occurred if the defendants actively and individually priced the VRDOs they managed as they were obligated to do.
 The relator analyzed the VRDOs for JPMorgan, Citigroup, Bank of America, and Morgan Stanley. For example, relator's analysis of JPMorgan is alleged, in part, as follows:
 
45. Relator's JPMorgan analysis included 1,377 VRDOs, which had a collective value at issuance of $49.3 billion. Massachusetts has been the issuer of 38 of these bonds (with a collective value at issuance of $2.6 billion). The analysis shows JPMorgan used bucketing to set the VRDO interest rates for at least 95 percent of the JPMorgan portfolio studied, including at least 37 of the 38 Massachusetts VRDOs in the study.
46. JPMorgan's pricing for these VRDOs can be broken down into four buckets, with the vast majority of the bonds-1,083 of them—residing in a single bucket. 27 of the bonds in this single bucket were issued by Massachusetts, representing roughly 71 percent of
---------------------------
  [10] For purposes of his analysis, the relator considered a particular bond to be part of a bucket if at least eighty percent of the time, the bond had the identical week-over-week rate change as the other bonds in the bucket for at least twenty-six weeks even though the interest rates themselves might have been different. There are no allegations concerning whether there existed macro-economic factors generally affecting the bond market that might account for these rate movements. "Bucketing" is another term coined by the relator for purposes of his complaint.
 - 10-
 
the Massachusetts VRDOs in the JPMorgan study. Attached hereto as Exhibit A is a listing of JPMorgan's entire Massachusetts VRDO portfolio which identifies for each VRDO: the issuer, CUSIP number, letter of credit provider, and whether it fell into a bucket under Relator's pricing analysis.
47. While each of the VRDOs in these JPMorgan buckets had the identical interest rate change as the other bonds in the bucket for at least twenty-six weeks, 80 percent of the time, the majority of the bonds were in their respective buckets for significantly longer than twenty-six weeks and at a significantly higher percentage than 80 percent of the time.
48. For example, with respect to the 1,083 VRDOs in JPMorgan's largest bucket, 941 of them had the identical interest rate change (at least 80% of the time) for a full year; 744 of them had the identical interest rate change (at least 80% of the time) for two years; and 634 of them had the identical interest rate change (at least 80% of the time) for the entire time they were in the market during the four-and-a-half-year study period.
49. Similarly, 1,004 of the VRDOs in this bucket had the identical interest rate change 90 percent of the time (for at least twenty-six weeks); 947 of them had the identical interest rate change 95 percent of the time (for at least twenty-six weeks); and 785 of them had the identical interest rate change 100 percent of the time (for at least twenty-six weeks).
Complaint at paras. 45-49. The relator performed a similar analysis for Citigroup, Bank of America (BofA), and Morgan Stanley.
 The relator asserts that, in his opinion, there is no economic or business justification for Robo-Resetting and that there is no statistical possibility that the defendants' VRDO pricing (if done actively, individually, and in consideration of the relevant market conditions) would result in widespread bucketing. In further support of this opinion, the relator also conducted a simulation based on what he characterized as real-world changes in the SIFMA weekly VRDO pricing index and the real-world distribution of these weekly rate changes across the entire
 - 11 -
VRDO market. The relator conducted one thousand such simulations, none of which yielded bond buckets as he defined them.
 Collusion in Robo-Resetting
 In addition, the relator asserts that the defendants have conspired together to carry out their Robo-Resetting scheme. He believes that this collusion is evident based on the bucketing that has occurred across the defendant banks. The relator provides five examples, which he contends, demonstrates collusion. For instance, in the first example, the relator explains:
 
As just one example, based on the same criteria used to identify single bank buckets, discussed above, Relator isolated a cross-bank bucket of 440 VRDOs from Defendants JPMorgan, Citigroup, Morgan Stanley and BofA, as well as from Wells Fargo, another major RMA but which largely conducts its RMA business outside Massachusetts. The average maximum 26-week matching rate for the bonds in this bucket over the four-and-a-half-year study period was 95%, broken out as follows: JPMorgan (143 VRDOs in bucket, with 93% matching rate); Citigroup (102 VRDOs in bucket, with 98% matching rate); Morgan Stanley (23 VRDOs in bucket, with 95.4% matching rate); BofA (100 VRDOs in bucket, with 92% matching rate); and Wells Fargo (72 VRDOs in bucket, with 97% matching rate).
Complaint at para. 75.
 The relator also points to three other circumstances that he alleges evidence collusion among the defendants. They are also based upon his review of public interest rate data. On February 15, 2012, Moody's put the short term credit rating of BofA under review for a downgrade, and there was a modest increase in average VRDO rates, but when the downgrade was announced in June, 2012 "the SIFMA index remained relatively flat." On December 15, 2015, the Federal Reserve raised the federal funds rate by 25 basis points, but the VRDO market rates did not start to climb until March, 2016, even though interest rates on short term
 - 12 -
commercial paper began to climb before the December announcement. Also, for several years prior to mid-2008, 7-Day AA non-financial, commercial paper typically traded at interest rates below VRDOs, but since then, VRDOs have traded, on average, at interest rates which exceed that of this type of commercial paper.
 What is Not Alleged 
 The court notes what is not alleged in the complaint. There are no allegations in the complaint that the relator has any information other than his own analysis of publicly available data to support the inferences of fraud or collusion that he describes in the complaint.[11]
 The Consequences of Robo-Resetting
 According to the relator, the defendants' conduct has caused the Commonwealth to pay hundreds of millions of dollars in VRDO overcharges, because they did not reset rates to the lowest rate that would clear the market for any of the VRDOs that they managed since April 1, 2009.
 The first type of overcharge relates to remarketing service fees. The defendants have caused the Commonwealth to pay for remarketing services that they never performed. The
---------------------------
  [11]In a paragraph in which the relator alleges that he would have expected tax exempt money market funds to sell VRDOs backed by BofA (presumably VRDOs in which the letter of credit was issued by BofA), but this did not happen, Relator goes on to allege: "This coordinated response was confirmed for relator in an April 2012 discussion with a senior BofA banker who conceded the Defendant RMAs had gotten together during this time and agreed it was best to keep investing in BofA-backed VRDOs irrespective of ratings detail." At oral argument on the motion to dismiss, counsel for the relator pointed to this sentence as evidence of non-public information alleged in the complaint. This sentence, however, says nothing about how rates were set for VRDOs. Indeed, it relates to acts undertaken by defendants, not as RMAs, but as managers of funds that invested in VRDOs. It appears to suggest conduct that caused interest rates on VRDOs to be lower than they would otherwise be. The court does not find this allegation to be material to the claim of fraud that is asserted.
 - 13 -
second type of overcharge relates to inflated interest rates for VRDOs. Robo-Resetting has caused the Commonwealth to pay inflated interest rates for their VRDOs. The third type of overcharge relates to letter of credit fees. Robo-Resetting has caused the Commonwealth to pay for letter of credit services that are rarely, if ever, utilized because inflated VRDO interest rates induce money market funds to retain the VRDOs in their portfolios.
 In sum, the relator estimates that Robo-Resetting has caused the Commonwealth at least $134 million in damages.
 Violation of the Massachusetts False Claims Act
 In his complaint, the relator brings a single claim for violation of the Act. The relator asserts that the defendants violated § 5B(a)(1) and other provisions of the Act when they "knowingly presented—or caused to be presented by money market funds, other VRDO investors, and non-defendant providers of letter of credit services—false or fraudulent claims for payment or approval by submitting, or causing to be submitted, invoices or statements to Massachusetts for payment for remarketing services, interest income, and letter of credit services which, because of defendants' Robo-Resetting scheme, were artificially high, the subject of collusion, and based on services never performed, not performed as promised or required, or ultimately unnecessary." Complaint at para. 120. In addition, the relator claims that the defendants violated § 5B(a)(2) and other provisions of the Act when they "knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by expressly or impliedly representing to Massachusetts that they have (i) reset or remarketed their VRDOs at the lowest possible rates, and (ii) reset or remarketed the VRDOs actively, individually and on a weekly basis, while actually engaging in a Robo-Resetting
 - 14 -
scheme where they have colluded in their rate-setting activity and collectively reset rates mechanically on a group-wide basis and at inflated prices and made no effort to reset or remarket the bonds competitively and at the lowest possible rates." Complaint at para. 121. The relator further alleges that the defendants' remarketing agreements with the Commonwealth (and remarketing circulars) detail the contractual commitments that they made to the Commonwealth and that "[e]vidence of false or fraudulent claims for payment or approval . . . can be inferred from defendants' contractual obligations, which are detailed in the remarketing circulars." Complaint at para. 125. The relator notes that: "Even though Relator does not have access to each specific claim for these services each defendant submitted each month for each of hundreds of VRDOs, it [sic] knows about defendants' illicit remarketing practices." Id.
DISCUSSION
 When evaluating the legal sufficiency of a complaint pursuant to Mass. R. Civ. P. 12(b)(6), the court accepts as true all factual allegations in the complaint and all reasonable inferences that may be drawn in the plaintiff's favor. Berish v. Bornstein, 437 Mass. 252, 267 (2002). However, to survive a motion to dismiss, a complaint must set forth the basis of the plaintiff's entitlement to relief with "more than labels and conclusions." Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-636 (2008), quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-1965 (2007). While factual allegations need not be detailed, they "must be enough to raise a right to relief above the speculative level . . . ." Id., quoting Bell Atlantic Corp., 127 S. Ct. at 1964-1965. At the pleading stage, a complaint must set forth "factual 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief. . . ." Id., quoting Bell Atlantic Corp., 127 S. Ct. at 1966.
 - 15 -
 As noted above, the defendants make several arguments in support of their motion to dismiss the relator's complaint; the court will consider only the public disclosure bar to qui tam actions.[12]
 Public Disclosure Bar
 The defendants move to dismiss the relator's complaint based on the Act's public disclosure bar. First, they argue that substantially the same transactions were publicly disclosed before the relator filed this action. Second, since the complaint is based upon publicly disclosed information, the relator may proceed only if he is an "original source" of the information, and he is not.
 In response, the relator asserts that: (1) allegations or transactions of fraud, and not ordinary information, trigger the public disclosure bar; (2) publicly available websites that disclose VRDO rates and commercial paper rates do not qualify as "news media" under the public disclosure bar; (3) the purported disclosures that the defendants point to, on their own or in the aggregate, cannot be considered "substantially the same" as allegations in the complaint; and (4) he is an original source of the allegations. For the reasons that follow, none of the relator's positions find support in the federal case law construing the Federal False Claims Act,
---------------------------
  [12] The parties submitted a number of exhibits for the court's consideration in connection with the defendants' motion to dismiss pursuant to a "Joint Stipulation Regarding the Court's Consideration of Certain Documents in Connection with Defendants' Motion to Dismiss Second Amended Complaint." See Paper Number 48. The exhibits include, among other things, various MSRB documents and screen captures of webpages. The court may properly evaluate those documents in assessing the defendants' motion to dismiss. See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016) (noting that courts may consider matters of public record, facts susceptible to judicial notice, and undisputed documents provided by parties in connection with Rule 12(b)(6) motion to dismiss based on public disclosure bar).
 - 16 -
31 U.S.C. §§ 3729 et seq. (the Federal FCA).
 The Massachusetts appellate courts have explained that Massachusetts courts must look to federal cases and treatises interpreting the similarly worded Federal FCA because "Where is little decisional law interpreting the [Massachusetts False Claims Act], and its legislative history is scant."[13] Scannell v. Attorney Gen., 70 Mass. App. Ct. at 49 n.4. See Phone Recovery Servs., LLC v. Verizon of New England, Inc., 480 Mass. at 229 (assessing federal case law in interpreting the Massachusetts False Claims Act).
 Although qui tam actions "can be powerful weapons for rooting out chicanery shrouded in darkness," the Act "forbids private suits once the sun has shone on the essential features of the alleged misconduct." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 203 (1st Cir. 2016). Thus, the Act's public disclosure bar provides that a qui tam action must be dismissed, unless opposed by the Commonwealth: "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed: (1) in a Massachusetts criminal, civil or administrative hearing in which the commonwealth is a party; (2) in a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation; or (3)from the news media, unless the action is brought by the attorney general, or the relator is an original source of the information." G.L. c. 12, § 5G(c) (emphasis added). The public disclosure bar aims to "strike a balance between encouraging whistle-blowing and discouraging opportunistic behavior." United States ex rel. Hagerty v. Cyberonics, Inc., 95 F.
---------------------------
  [13] The parties do not cite, and the court is unaware of, any Massachusetts state appellate case law discussing the Act's public disclosure bar.
 - 17 -
Supp. 3d 240, 254 (D. Mass. 2015).
 The court first determines "whether the allegations or transactions identified in the relator['s] complaint have already been publicly disclosed." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 208. If there has been a public disclosure, then the court looks to "whether that disclosure occurred through one of the statutorily prescribed methods." Id. "And if these two queries yield affirmative answers, . . . [the court] proceed[s] to examine whether the allegations or transactions on which the relator['s] suit rests are substantially the same as the publicly disclosed allegations or transactions." Id.
 Disclosure
 Turning to the first question: were the essential elements of the transactions and the events underlying the relator's allegations disclosed through public sources? See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 210-211. A "public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009), citing United States ex rel. Springfield Term. Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994) (Springfield). The United States Court of Appeals for the First Circuit has explained that:
 
This type of disclosure can occur in one of two ways: either through "a direct allegation of fraud" or through the revelation of "both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.". . . These sets of facts may originate in different sources, as long as they "lead to a plausible inference of fraud" when combined.. . . The ultimate inquiry, of course, is whether the government has received fair notice, prior to the suit, about the potential existence of the fraud.
 - 18 -
United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 208-209. Moreover, "[a] relator cannot bring a qui tam suit based on publicly disclosed facts, even if [his or] her expertise makes [him or] her the first to understand the alleged fraud." United States ex rel. Conrad v. Abbott Labs., Inc., No. 02-11738-RWZ, 2013 WL 682740, *4 (D. Mass. Feb. 25, 2013) (noting that "only question is whether the material facts exposing the alleged fraud are already in the public domain, not whether they are difficult to recognize").
 In the present case, the defendants do not contend that "substantially the same allegations" were publicly disclosed prior to the relator filing his complaint. See G.L. c. 12, § 5G(c) (emphasis supplied). This is not surprising, as the defendants maintain that the relator's complaint does not actually set out a plausible allegation of fraud.
 Rather, it is the defendants' position that "substantially the same. . . transactions as alleged in the action or claim were publicly disclosed" prior to the relator filing suit. G.L. c. 12, § 5G(c) (emphasis added). The court agrees. In the frequently cited Springfield decision, the D.C. Circuit Court of Appeals explained:
 
[I]n common parlance, the term "allegation" connotes a conclusory statement implying the existence of provable supporting facts. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 55 (1976). The term "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another. . . On the basis of plain meaning, and at the risk of belabored illustration, if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. The language employed in. . . [the False Claims Act] suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.
 -19-
Springfield, 14 F.3d at 653-654 (emphasis added). Applying this methodology to the instant case, X and Y (the essential and critical elements of the fraudulent transaction) are all in the public domain, and therefore, the "transactions" as alleged in the relator's complaint were publicly disclosed.
 Given the nature of the fraud alleged in this case, it is somewhat difficult to identify just what constitutes X and Y. It appears to the court that X constitutes the obligations that the defendants have undertaken as RMAs. This is to set the lowest rates for a particular VRDO that will, in the RMA's judgment, cause all such bonds that holders have tendered for repurchase to clear the market at par plus accrued interest, and then to market the bonds to a broad array of potential purchasers. The relator contends that this requires the defendants "to actively and individually reset and remarket Massachusetts's VRDOs at the lowest possible rate."[14]
 As described above, the relator alleges three sources for this obligation: (1) MSRB rules that address RMA duties to VRDO issuers; (2) SIFMA Model Disclosures; and (3) the remarketing agreements between the defendants and the Commonwealth. Applying the Springfield methodology, these documents, which set forth the obligations of RMAs, are the misrepresented state of facts because the defendants did not do this, and they therefore constitute X. It is undisputed that they are in the public domain.
---------------------------
 [14] The complaint points to statements made by the defendants to the Commonwealth that they would market the VRDOs "to the widest possible base of investors" as a means of achieving "the lowest overall cost of its paper." Complaint para. 36. There are no allegations in the complaint that this did not occur. Rather, the thrust of the claim is that remarketing was easier for RMAs because investors were satisfied with the interest rates and did not exercise puts as often as they would have if the rates had been lower.
 - 20 -
 Y are the interest rates set by the defendants for the VRDOs for which each is an RMA. See Defendants' Memorandum at 18. The VRDO interest rates are publicly available in each bond's Official Statement, which are posted on the Electronic Municipal Market Access (EMMA) website. Also, RMAs are required to report interest rate reset information to MSRB, which makes those rates available in real-time on EMMA. Other SIFMA index information that the relator relies on is available from Bloomberg. Again, in Springfield parlance, the rates as set are the "true state of facts," and constitute the second element of the fraudulent transactions. See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 208-209 (noting that disclosure can occur through revelation of "both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud" and that these sets of facts may originate in different sources, as long as they "lead to a plausible inference of fraud").
 Combining X and Y leads to Z, which represents the allegation of fraud. Z is the allegation that the defendants are not setting the VRDO interest rates at the lowest possible rates and instead, they are colluding and engaging in Robo-Resetting in violation of their alleged obligations. All of X and Y were and are readily available to any member of the public interested in analyzing it. The fact that the relator may have some specialized knowledge or background concerning the municipal bond industry and spent a thousand hours dissecting public information does not, in itself, allow him to file and prosecute a qui tam action. See United States ex rel. Conrad v. Abbott Labs., Inc., No. 02-11738-RWZ, 2013 WL 682740 at *4. See also United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 210, quoting United States ex rel. Findley v. FPC-Boron Emps. 'Club, 105 F.3d 675, 688 (D.C. Cir. 1997) ("A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction
 - 21 -
does not alter the fact that the material elements of the violation already have been publicly disclosed"). Despite the description of the realtor's forensic analysis set out in his complaint, the relator's allegations in this case simply "repeats [the facts] the public already knows." Wang v. FMC Corp., 975 F.2d 1412, 1417 (9th Cir. 1992).
 Accordingly, the transactions identified in the complaint have already been publicly disclosed.
 Source
 Next, the court must decide if the disclosure of this information occurred through one of the statutorily prescribed methods set out in the Act. In this case, the question is whether it was disclosed in the "news media." See G.L. c. 12, § 5G(c). The Act does not define the term "news media." However, courts that have considered the issue have construed "news media" to include "readily accessible websites." United States ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 257 n.7 (D. Mass. 2015). See United States ex rel. Green v. Service Contract Educ. & Training Trust Fund, 843 F. Supp. 2d 20, 32 (D. D.C. 2012) (collecting cases). See also United States ex rel. Osheroff v. Humana, Inc., 776 F.3d 805, 813 (11th Cir. 2015) (explaining that the term "news media" has a "broad sweep" and holding that publicly available websites intended to disseminate information qualify as "news media" for purposes of public disclosure); United States ex rel. Kraxberger v. Kansas City Power & Light Co., 756 F.3d 1075, 1078-1079 (8th Cir. 2014) (determining that hearing testimony qualified as a disclosure through news media because it was publicly available on a public website). The relator draws from information available on the publicly available EMMA website, Bloomberg, and other public websites designed to
 - 22 -
provide information to the public about municipal bonds. [15] Broadly interpreting the term "news media" for purposes of the Act as have the federal courts, this court concludes that these sources of information qualify as news media under the public disclosure bar.
 Substantially the Same Transactions 
 The allegations in the complaint reference substantially the same transactions publicly disclosed in these sources, and they were obviously disclosed before the relator filed this action. Indeed, the only transactions alleged in the complaint are those selected by the relator by mining these sources. In evaluating substantial similarity, the court should bear in mind the core purpose of the Act: to encourage suits by individuals with valuable knowledge of fraud that is unknown to the government. See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 210; United States ex rel. Ondis v. City of Woonsocket, 587 F.3d at 58. "[A] complaint that targets a scheme previously revealed through public disclosures is barred even if it offers greater detail about the underlying conduct." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d at 210. While it may be true that the realtor's forensic analysis is unique to him and has caused him to reach certain opinions concerning how the defendants set the interest rates, the relator does not dispute that his analysis is performed on publicly available information.
 The Exception: Original Source
---------------------------
  [15] "The EMMA website was established to increase the transparency of the municipal securities market by providing free public access to municipal securities disclosures and data. EMMA provides investors, state and local governments and other market participants with key information and tools to put that information into context." EMMA, Electronic Municipal Market Access, Overview, https://emma.msrb.org/AboutEmma/Overview.
 - 23 -
 A relator may still avoid dismissal under the Act's public disclosure bar if he or she qualifies as an "original source." G.L. c. 12, § 5G(c). The relator claims that the public disclosure bar does not apply in this case because he is an original source of his allegations. The court disagrees. The Act defines an "original source" as an individual who:
 
(1) prior to a public disclosure under paragraph (3) of section 5G, has voluntarily disclosed to the commonwealth or any political subdivision thereof the information on which allegations or transactions in a claim are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the information to the commonwealth or any political subdivision thereof before filing a false claims action.
G.L. c. 12, § 5A (emphasis added). The relator argues that he provided knowledge and analysis that was independent of and materially added to the publicly-disclosed allegations or transactions. Again, the court disagrees.
 "Virtually by definition, a relator whose knowledge is dependent upon the public disclosure of allegedly fraudulent transactions cannot be said to have independent knowledge of the fraud." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d at 59. Moreover, "[i]f a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a qui tam action cannot proceed." Id., quoting United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d at 688. "Expertise that enables a relator to understand the significance of publicly disclosed information, without more, is insufficient to qualify him as an original source." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d at 59-60. In particular, forensic analysis of data and transactions that are already publicly disclosed on publicly accessible websites is insufficient to qualify the
 - 24 -
relator as an original source. See United States ex rel. Estate of Cunningham v. Millennium Labs. of Cal., Inc., 713 F.3d 662, 673 (1st Cir. 2013) ("Knowledge is 'independent' if it did not depend on the public disclosure. . . ."); United States ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d. at 260 (same). See also United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1160 (3d Cir. 1991) (recognizing that "a relator who would not have learned of the information absent public disclosure did not have 'independent' information within the statutory definition of 'original source"). Indeed, even the events that the relator uses as benchmarks to consider how average prices of VRDOs responded to these changed market conditions were publicly disseminated: the first increase in the federal funds rate in several years; Moody's downgrade of BofA; and the change in the relationship of interest rates for VRDOs backed by investment banks and non-financial commercial paper at or about the time of the collapse of Lehman Brothers. See United States ex. rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d at 1160 ("[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If the latter were enough to qualify the relator as an 'original source,' then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase."). See also United States ex rel. Alcohol Foundation, Inc. v. Kalmanovitz Charitable Foundation, Inc., 186 F. Supp. 2d 458, 461-464 (S.D.N.Y. 2002) (dismissing relator's complaint based on allegations that arose out of a "perspective" that plaintiff obtained by spending hundreds of hours compiling facts into a "mosaic" and concluding that relator was not an original source). Since the relator's "knowledge
 - 25 -
is dependent upon the public disclosure of allegedly fraudulent transactions," he does not qualify as an "original source." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d at 59.[16]
 This is not a case in which an insider or market participant has revealed previously non-disclosed information demonstrating that a defendant has filed or caused to be filed false claims for payment from the Commonwealth. For example, the relator has no information concerning the manner in which the defendants actually used technology to determine rates. He does not disclose agreements to act in unison to the detriment of issuers. There are simply no factual allegations in the complaint based on information or data that was not disclosed to the public on readily accessible websites. His analysis of that data, whether useful or flawed, does not make him an original source of information.
---------------------------
  [16] During oral argument, relator's counsel argued that United States ex rel. Ven-A-Care v. Actavis Mid At!. LLC, 659 F. Supp. 2d 262, 266 (D. Mass. 2009) (Ven-A-Care), supported his position that one could be an original source of information based on an analysis of publicly disclosed data. The court finds that Ven-A-Care does not support that contention. Ven-A-Care was one of the many cases involving average wholesale pricing claims brought against the pharmaceutical industry. While much background information concerning average wholesale prices of drugs on an industry-wide basis was publicly available, particular prices charged by particular defendants were not. In Ven-A-Care, the relator alleged specific information concerning the prices at which almost 1,400 subject drugs were offered for sale to it over a period of sixteen years. Id. at 265.
 - 26 -
ORDER
 For the foregoing reasons, the Defendants' Joint Motion to Dismiss the Second Amended Complaint is ALLOWED. Final Judgment shall enter dismissing the Second Amended Complaint.
@/s/Mitchell H. Kaplan Justice of the Superior Court
@July 23, 2019
xxz
- 27 -